The UNIVERSITY OF COLORADO FOUNDATION, INC.; The University of Colorado, an institution of the State of Colorado; The Board of Regents of the University of Colorado, a body corporate of the State of Colorado; Robert H. Allen, an individual; and Paul A. Seligman, an individual, Plaintiffs,

v.

AMERICAN CYANAMID COMPANY, a Maine corporation, Defendant.

No. CIV. A. 93–K–1657.

United States District Court, D. Colorado.

July 26, 2001.

See also 105 F.Supp.2d 1164.

**1232**

Harold A. Haddon, Haddon, Morgan & Foreman, P.C., Glenn K. Beaton, Gibson, Dunn & Crutcher, Robert N. Miller, Frederick Thomas Winters, Stephanie Erin Dunn, LeBoeuf, Lamb, Greene & MacRae, L.L.P., United States District Court, Denver, CO, for plaintiffs.

Roger P. Thomasch, Ballard, Spahr, Andrews & Ingersoll, LLP, Mark A. Wielga, Temkin, Wielga & Hardt, L.L.P., Denver, CO, Paul A. Ramundo, Donovan Leisure Newton & Irvine, Richard J. DeMarco, Jr., Reed, Smith, Shaw & McClay, Daniel J. Thomasch, Lauren J. Elliot, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for defendant.

## PRELIMINARY OPINION TO GUIDE FINDINGS OF FACT AND CONCLUSIONS OF LAW

KANE, Senior District Judge.

After an initial trial,[1] appeal to the Federal Circuit[2] and a bifurcation of liability and damages issues on remand,[3] this long-

---

[1] The initial trial took place after I had issued my opinions in *University of Colo. Found., Inc. v. American Cyanamid*, 880 F.Supp. 1387 (D.Colo.1995)(*Cyanamid I*)(rejecting, as a matter of law, Plaintiffs' common law claim of conversion as well as Plaintiffs' claim for correction of patent under 35 U.S.C. § 256 but finding Plaintiffs had standing to pursue claims for equitable title/relief under Patent Act) and *University of Colo. Found., Inc. v. American Cyanamid Co.*, 902 F.Supp. 221 (D.Colo.1995)(*Cyanamid II*) (on reconsideration of *Cyanamid I*, agreeing with Cyanamid that Plaintiffs' equitable title claim must fall with claim for relief under § 256 of Patent Act). *See University of Colo. Found. v. American Cyanamid Co.*, 974 F.Supp. 1339, 44 U.S.P.Q.2d 1231 (D.Colo.1997)(*Cyanamid III*).

[2] In a decision issued November 19, 1999, the Federal Circuit Court of Appeals affirmed in part and reversed in part my rulings in *Cyanamid I, II* and *III*, vacating certain of my findings and legal conclusions and remanding the case for further proceedings. *See University of Colo. Found., Inc. v. American Cyanamid Co.*, 196 F.3d 1366 (Fed.Cir.1999).

[3] On July 7, 2000, I issued a Memorandum Decision on Remand, bifurcating the issues of liability and damages. *University of Colorado Found. v. American Cyanamid Co.*, 105 F.Supp.2d 1164, 55 U.S.P.Q.2d 1909 (D.Colo.2000)(*Cyanamid IV*). In *Cyanamid IV*, I reiterated and supplemented my conclusions that University of Colorado Doctors Allen and Seligman were the true inventors of '634 Patent technology; that Cyanamid defrauded the University and the Doctors when it secretly patented their invention; and that Cyanamid had been unjustly enriched by its misconduct. In addition, and in accordance with the Federal Circuit's rulings on appeal, I also held that the Doctors were entitled under 35 U.S.C. § 256 to the substitution of their names on the Patent for that of the named inventor, Cyanamid's Dr. Ellenbogen, which, in turn, established the University's equitable title to the Patent. *Id.*, 105 F.Supp.2d at 1184.

standing patent-related fraud and unjust enrichment action is before me for preliminary rulings to guide the preparation of final findings and conclusions as to the appropriate relief to be awarded Plaintiffs on their claims. I will address the major legal issues raised by the parties regarding the nature and scope of the remedies available on remand, and make various threshold factual and legal determinations to tailor the proposed findings and conclusions that will follow.

These threshold findings and conclusions culminate in a determination that the University is entitled to an amount of actual damages reflecting the 1981 world in which royalty rates and licensing fees would have been determined had the Doctors and the University decided at that time to sell Cyanamid exclusivity rights to the '634 Patent technology, and that the University is entitled to equitable relief in the form of a disgorgement of Cyanamid's profits attributable to the exclusivity rights wrongfully secured and enforced against competitors. I find disgorgement is warranted as an exercise of my discretion under Colorado law based on the egregiousness of Cyanamid's misconduct, the unavailability without it of a complete remedy for Plaintiffs, and the fact that the financial gain realized by Cyanamid as a result of its misconduct exceeds the quantifiable financial loss to Plaintiffs.

## I. *THE FEDERAL CIRCUIT'S MANDATE AND APPELLATE WAIVER.*

In its Motion Regarding Appropriate Scope of Damages Retrial on Remand (filed August 23, 2000) and again in its Trial Brief before the damages retrial, Cyanamid argues Plaintiffs cannot "renew claims previously tried to conclusion and

not appealed," including Plaintiffs' "claim" for disgorgement, any "claim" for damages or other relief based on Cyanamid's alleged spoliation of evidence, and "any claim for punitive damages beyond what the Court awarded at the end of the initial trial." Def.'s Trial Br. at 5. I do not consider the latter two concerns to involve issues of waiver, or even consider them "claims." Generally, I agree both are beyond the scope of appropriate relief to be awarded on remand. "Damages" related to Cyanamid's alleged spoliation of evidence are more properly considered in Plaintiffs' Motion for Sanctions and have been deferred for consideration until after the issues on remand are fully addressed. I address punitive damages in a separate section below. Whether disgorgement of profits remains a viable remedy on Plaintiffs' claim for unjust enrichment is a more contentious issue, requiring some background before being addressed.

### *My Rulings in Cyanamid III.*

In *Cyanamid III*, I analyzed the doctrine of unjust enrichment as recognized by Colorado courts in *Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788, 795 (Colo.1991)(en banc) and *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n*, 649 P.2d 1093, 1096–97 (Colo.1982)(en banc).[4] "The scope of the remedy for unjust enrichment [under Colorado law] 'is broad'," I determined, "'cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.'" *Cyanamid III*, 974 F.Supp. at 1358 (quoting *Cablevision* at 1097 and citing the *Cablevision* court's reliance on Palmer, Law of Restitution § 1.1 (1978) and 66 Am.Jur.2d Restitution § 11).

---

4. On remand, I also found the Colorado Supreme Court's en banc decision in *EarthInfo, Inc. v. Hydrosphere Resource Consultants,* *Inc.*, 900 P.2d 113 (Colo.1995) instructive in this regard.

Applying Colorado law, I determined Plaintiffs conferred a benefit on Cyanamid, which Cyanamid appreciated, under circumstances that rendered its retention by Cyanamid inequitable. *Cyanamid III*, 974 F.Supp. at 1354. The benefits realized by Cyanamid, I found,

> include Cyanamid's post-Patent profits attributable to the Patent, as well as any other industry or market advantages Cyanamid gained as a result of having the Patent. To prevent the injustice that would result if Cyanamid were permitted to retain these ill-gotten gains, the law of restitution would require me to order Cyanamid to disgorge them.

974 F.Supp. at 1358. I noted a dilemma exists when a plaintiff has also suffered a quantifiable and therefore compensable financial loss as a result of defendant's misconduct, raising the specter that the legal and equitable remedies may overlap in all or in part. 974 F.Supp. at 1359 (observing that fundamental to any remedial scheme is the principle that a plaintiff cannot recover twice for the same injury). While Plaintiffs claimed Cyanamid's profits were greater than their loss such that they were entitled to both compensation and disgorgement over and above the amount of that compensation, I found Plaintiffs had presented no profits-related evidence to support it. Instead, the only evidence presented was that Plaintiffs' loss and Cyanamid's benefit coincided—i.e., "Plaintiffs were damaged in the amount of the reasonable royalty or licensing fee they should have received for their idea and Cyanamid benefitted in that same amount by not having to pay." *Id. See also Cyanamid IV*, 105 F.Supp.2d at 1184.

### The Federal Circuit's Rulings on Appeal.

On appeal, the Federal Circuit specifically observed that Cyanamid failed "to argue that the district court erred in any findings under its unjust enrichment analysis" and therefore "[declined to] review those findings." 196 F.3d at 1374. The Court recognized that "a defendant who uses a benefit provided by the plaintiff in an unauthorized and unfair manner may be liable in Colorado for unjust enrichment," *id.* (citing *Cablevision*), but vacated the judgment of liability for unjust enrichment entered in *Cyanamid III* because that claim, like the common law claim for fraud, "hinged" on a finding that the Doctors invented the subject matter of the '634 patent. *Id.*

On remand, Cyanamid argues the Federal Circuit's refusal to review my finding that Plaintiffs were not entitled to disgorgement renders it the law of the case, invoking the mandate rule of *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed.Cir.1997) (mandate limited to matters appealed, and on remand, district court cannot give relief beyond scope of mandate). Trial Br. of Cyanamid (filed 3/2/01) at p. 6. Specifically, Cyanamid contends the issue of disgorgement "w[as] fully litigated in the initial trial," was denied "based on a failure of proof," and was not appealed by Plaintiffs. *Id.*

### Analysis.

■ As an initial matter, the issue of disgorgement was not fully litigated in the initial trial, largely because of Cyanamid's failure, in discovery leading up to the first trial, to produce profits and similar evidence related to the value of the '634 Patent to Plaintiffs on ground such evidence was irrelevant. As such, it is not at all clear to me that the law of the case doctrine or mandate rule even apply. More important, however, is the principle that neither the law of the case doctrine nor the mandate rule precludes reconsideration of an issue such as disgorgement even if they were deemed to apply.

■ The law of the case doctrine and mandate rule are not "unassailable lim-

it[s]" on a court's jurisdiction, but "prudential doctrines that direct a court's discretion." *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed.Cir.2001). *See Mason v. Texaco*, 948 F.2d 1546, 1553 (10th Cir.1991)(citing *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)) (Holmes, J.)(doctrines "merely express[ ] the practice of courts generally to refuse to reopen what has been decided, not a limit to their power"); *see generally* 18 C. Wright, A. Miller & E. Cooper, Fed. Practice & Procedure § 4478 (West 1981)("although courts are often eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish"). It may be appropriate in some circumstances for a court to revisit an issue that would otherwise be deemed waived and beyond the scope of an appellate mandate. *Tronzo* at 1349. While such circumstances should be exceptional, courts will consider revisiting issues otherwise foreclosed where, for example, "there has been a substantial change in the evidence." *Id.* Such circumstances exist here.

After the Federal Circuit issued its decision and remanded this case for further proceedings, Plaintiffs filed a Motion for Entry of Judgment, arguing the Federal Circuit's mandate could be effected on the existing record as a matter of law. Specifically, Plaintiffs argued the record as it existed was adequate to establish that the Doctors were the true and sole inventors of the '634 Patent technology under federal patent law standards of inventorship without the need for a new trial or evidentiary hearing, which determination would warrant the reinstatement of both the liability and damages determination in *Cyanamid III* as a matter of law. *See* Pls.' Mot. Entry of Judgment (filed 1/7/00) at p. 2, *discussed in Cyanamid IV*, 105 F.Supp.2d at 1174–75. In its response to Plaintiffs' Motion, Cyanamid agreed there was "no need to reopen the record on liability issues," but argued strenuously that "the procedural posture of this case on remand (where a determination of inventorship under the federal patent laws is the predicate for any liability) is *completely changed* from the procedural setting at trial (at which time all patent law claims had been dismissed)." Cyanamid's Mem. Law in Opp'n to Pls.' Mot. Entry Jm. (filed 2/3/00) at 2 (emphasis added). "[I]f damages are to be awarded," Cyanamid continued, "it would be an abuse of discretion to preclude Cyanamid from introducing new evidence on damages." *Id.* at 3.

After considering the parties' respective arguments, I agreed a redetermination of liability issues under federal patent standards of inventorship could be made under the existing record, but rejected Plaintiffs' assertion that no new evidence on damages should be allowed. *Cyanamid IV*, 105 F.Supp.2d at 1183–84. Instead, I agreed with Cyanamid and determined that "all issues of damages should be reopened." *Id.* In doing so, I specifically determined that "the parties [be] afforded an opportunity to present additional evidence on the issue of actual damages *and related equitable remedies* to be awarded Plaintiffs ...." *Id.* The gist of Cyanamid's argument now is that this additional evidence may only be considered for the purposes of reducing Plaintiffs' damages on the fraud claim. As to the unjust enrichment claim, Cyanamid argues Plaintiffs should be bound by the "failure of proof" at the first trial.

The reopening of damages and related equitable remedies was subjected to the formalities of a Scheduling Conference (held August 2, 2000) and Scheduling Order (issued August 22, 2000), which set a February 15, 2001, discovery deadline and March 5, 2001 trial date. The parties participated vigorously in the post-remand discovery process, exchanging tens of

thousands of pages of documents, much of it Materna sales figures and documents related to Cyanamid's pursuit and prosecution of the '634 Patent either unaccounted for or withheld by Cyanamid in the proceedings leading up to the first trial in 1996.[5] Both parties designated numerous additional experts who would testify as to the value of Plaintiffs' loss as a result of Cyanamid's secret securing of exclusivity rights to the patented technology as well as to the value, to Cyanamid, of having secured such rights. The process was acrimonious and hard fought. Having secured the right to reopen the evidence to challenge the royalty rate and sales figures

---

**5.** Included in the newly produced documents was the long-lost "Record of Invention" prepared by Dr. Leon Ellenbogen in 1984. The late disclosure prompted cries from Plaintiffs for sanctions and a request for additional/supplemental liability determinations premised on the Record of Invention on remand. *See* Pls.' Mot. for Sanctions, for Order for Additional Findings, Further Proceedings and Plenary Relief based on Cyanamid's Belated Production of the Record of Invention, Fraud, and Litigation Misconduct (filed 11/20/00) and Supplement to Motion (filed 6/7/01). Rather than reopen liability issues and alter or supplement those findings already made in *Cyanamids III* and *IV,* I opted to treat the issue as one for sanctions to be addressed as a separate matter after the damages retrial. In anticipation of Cyanamid's argument on further appeal, I will say, however, that the Record of Invention does nothing to change my mind with respect to Dr. Ellenbogen's credibility on the issue of conception.

The Record of Invention completed by Dr. Ellenbogen provides a conception date of "9–21–79" and refers to "Memo—Dr. R.H. Allen to Dr. E. [sic] Ellenbogen" as corroboration for this date. The reference is apparently to Dr. Allen's September 21, 1979 letter to Dr. Ellenbogen, admitted into evidence in the first trial as Ex. 68, in which Dr. Allen reports the results of the Doctors' *initial* serum study (Study I), which found nothing more than that iron absorption rates for both Materna and Stuartnatal were poor. (Tr. Ex. 68 (absorption "might be as little as one mg, an amount that would not be sufficient to maintain iron stores in pregnant women").) The identification of mineral salts as the culprits in iron absorption and the initial idea of decreasing the calcium and magnesium salts in Materna to increase the absorption of iron did not even arise until the completion of Studies IA and II, *see Cyanamid IV* at 1167 ("[o]ut of Studies IA and II came the initial idea at the heart of this litigation, namely, that the large amounts of calcium carbonate and magnesi-um oxide in Materna were inhibiting iron absorption and that Materna could be reformulated to reduce or eliminate this effect"), which did not take place until November 1979 and were not reported to Dr. Ellenbogen until December 4, 1979. Letter from Dr. Allen to Dr. Ellenbogen dated 12/4/79 (Tr. Ex. 79.) This initial idea, in turn, was not reduced to a "complete and operative invention, as it is hereafter to be applied in practice" for purposes of federal inventorship standards under *Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1228 (Fed.Cir.1994), until February 1980, when Study IIA, which identified the specific levels of calcium carbonate and magnesium oxide at which the inhibitory effect on iron absorption occurred, was completed. *See Cyanamid IV,* at 1167–68, 1176–77 (applying *Burroughs* and citing both Dr. Allen's trial testimony and Dr. Allen's March 14, 1980 letter to Dr. Ellenbogen (Tr. Ex. 85) reporting on Study IIA).

Simply put, there was no "conception" or "invention," by *anyone,* of a reformulation idea in September 1979, and certainly none that is evidenced by a letter, written by someone other than the claimed inventor, merely identifying the absorption problem in the first instance. Dr. Ellenbogen's reference to the September 1979 letter in the Record of Invention, had I reopened evidence to consider it on remand, would have served only to corroborate the adverse inference drawn in *Cyanamid III* and reiterated in *Cyanamid IV,* perhaps even intensifying my conviction that Dr. Ellenbogen's claims of inventorship were false. It certainly would not, as Cyanamid suggested repeatedly throughout the disputes regarding the Record's production, have been viewed as "corroborat[ing]" Dr. Ellenbogen's trial testimony that he "conceived of increasing iron absorption by reducing the amounts of calcium carbonate and magnesium oxide . . . in . . . 1979." *See e.g.,* Br. of Def. Cyanamid in Opposition to Pls.' Nov. 21 Motion for Sanctions and Other Relief (filed 12/19/00) at 1–2.

evidence presented by Plaintiffs at the first trial, Cyanamid urges application of the law of the case doctrine and mandate rule to prevent Plaintiffs from using this evidence for any other purpose. The Federal Circuit's mandate was not so limited, and, even if it were, I find the substantial new evidence disclosed and presented on remand warrants reconsideration of the question of disgorgement.

## II. *ACTUAL DAMAGES—FRAUD.*

[3] My findings and conclusions on the issue of Cyanamid's liability for fraudulent nondisclosure are fully set forth in my Memorandum Opinion in *Cyanamid IV*. Any award of damages on remand, however, is subject to the Federal Circuit's note, at page 1373 of its opinion that my damages determination included two "errors": (1) that the University was "deprived of financial opportunities and prestige [it] would have enjoyed had [its] doctors been credited with the invention"; and (2) that the doctors were harmed "both personally and professionally" as a result of Cyanamid's fraud. *Cyanamid*, 196 F.3d at 1373 (referring to findings made at 974 F.Supp. at 1353). Given that the Doctors "intended to, and did, freely share their research results to allow Cyanamid to make and sell an improved Materna formulation" and that the "University ha[d] never been in the business of manufacturing or marketing prenatal vitamins," the Federal Circuit determined the only financial opportunity the University could have lost as a result of Cyanamid's fraud was "the payment that Cyanamid would have made to secure the Doctors' cooperation in filing the required documents with the PTO, an assignment of ownership rights and/or an exclusive license from the University." *Id.* at 1374. Much has been made of this language on remand and I pause briefly to make the following point.

The damage award in *Cyanamid III* was "the reasonable royalty Plaintiffs could have expected had they assigned or transferred exclusive rights to the reformulation to Cyanamid," *Cyanamid III*, 974 F.Supp. at 1357, precisely the type of damages I have been instructed to award, if the evidence supports them, on remand. The nature of the damages to be awarded Plaintiffs for Cyanamid's fraud was, and has always been, a reflection of the value, to Cyanamid, of the *patent* it secretly secured and fraudulently failed to disclose to the true inventors, not the value to Cyanamid of making and selling a reformulated product generally. There were no damages awarded in *Cyanamid III* for any loss to the University of an opportunity to make or sell reformulated Materna and no damages awarded for any "loss of prestige." The Federal Circuit's admonition on appeal was just that—a sage monition to evaluate, when reconsidering any reimposition of an award of damages on remand, the state of affairs that existed in 1981. This I will do.

Having said that, I turn to the task at hand. In *Cyanamid III*, I applied a 12% royalty rate to the aggregate sales figures presented by Plaintiffs to award Plaintiffs $44,396,159 in damages. I used those figures because they were the only evidence on royalty rates and sales figures presented at the original trial. Cyanamid failed to present any.[6] After Cyanamid secured the

---

6. The only evidence presented at trial attempting to quantify [the] loss [to Plaintiffs, of the patented idea's value] was Plaintiffs' tables and expert testimony projecting Cyanamid's net sales of reformulated Materna through the life of the Patent and identifying the reasonable royalty Plaintiffs could have expected had they assigned or transferred exclusive rights to the reformulation to Cyanamid. Cyanamid offered no evidence to dispute the sales figures or the royalty calculations, and I accept them as fact.

*Cyanamid III* at 1357.

opportunity to reopen damages evidence on remand, substantial additional evidence on royalty rates and sales figures was presented.

In determining the amount of any payment Cyanamid would have made to secure the Doctors' "cooperation in filing the required documents with the PTO, an assignment of ownership rights and/or an exclusive license from the University" so that it could lawfully patent the Doctors' reformulation technology, *see* 196 F.3d at 1374, the Federal Circuit advised that I "consider the usual and customary arrangements at the time of the filing of the patent application." *Id.* Much evidence on such customary arrangements was presented at trial, mainly through the expert testimony of Messrs. Alpert, McCool and Atkinson. In addition, there was substantial evidence offered by Plaintiffs as to the comparative sophistication of the University, and Dr. Allen in particular, in licensing negotiations as compared to universities and faculty researchers generally in the 1981 time frame.

After hearing all of the evidence, old and new, I find conclusively and beyond any doubt that Cyanamid saw substantial value in securing exclusive rights to the reformulation technology in 1981. By introducing reformulated Materna in the fall of 1981 and then filing a patent application shortly thereafter, Cyanamid knew it would have a 1981 trigger date for future enforcement actions against manufacturers who were marketing generic Materna formulations after that date. This is evidenced by documents revealing that Cyanamid was preparing, even before issuance of the patent, to enforce its exclusivity rights against such manufacturers as soon as the patent issued, "unless the[ir] product[s] w[ere] on the market prior to December, 1980." 9/12/83 Internal Cyanamid Mem. (Ex. 225) at p. 1. As Professor Rubinfeld explained in his testimony, Cyan-

amid was aware of other direct value that would flow from the securing of exclusivity rights, such as the building up of the Materna trademark and the virtual elimination of "leakage" associated with the substitution by pharmacists of generics for prescribed brand-name products. *See* Rubinfeld Test. (Trial Tr. Vols. IV and V) at 595–96, 648–49. Because the substitution rate for unpatented brand-name products is as high as 50%, marketing dollars spent promoting those products yield returns as low as 50 cents on the dollar. A patented product, by contrast, gives the manufacturer a much higher return on every marketing dollar and adds significantly to the value of the patent. *See id.*

### Up–Front Payment and Reasonable Royalty Rate.

Having determined that Cyanamid would have entered into negotiations strongly motivated to acquire exclusive rights to the Doctors' reformulation technology, I note the task of actually recreating the hypothetical negotiations proved difficult as an evidentiary matter. The speculative nature of the task was such that the evidence presented consisted largely of "expert" anecdotes or opinions as to what that particular expert, personally, or what a licensing negotiator of that era, generally, "would have done" as a participant in such negotiations in 1981.

Each side professed that its expert and witnesses were capturing the "real world" of what would have happened between the parties in 1981, while the other side was dwelling in a land of irrelevant assumptions and make believe. While I found Plaintiffs ultimately had the upper hand in this regard in the testimony of Mr. Alpert and Dr. Allen, neither side was particularly successful at recreating the hypothetical 20–year old transaction required. The reason for this will be revisited in the section that follows on equitable relief. In

short, there was an "otherworldly" element to the endeavor, because the reality of the situation was not only that neither the Doctors nor the University had any intention of entering into such a transaction, but Dr. Ellenbogen was at the same time falsely, and secretly, claiming that he was the inventor of the Doctors' reformulation technology. In order to hypothesize the arms-length transaction required, however, the parties' experts had not only to presume away Dr. Ellenbogen's theft and assume Cyanamid was coming to the table openly to secure exclusivity rights to technology it knew had been invented by the Doctors, but also to presume, in contravention of what I have explicitly found to have been the case, that the University and Doctors were willing to sell them in the first place.

Nevertheless, and in keeping with the Federal Circuit's admonition that the University's financial loss be calculated in terms of the hypothetical amount Cyanamid would have paid had it engaged in arms-length licensing negotiations with the University in 1981, I find the evidence presented established that payment to the University would have been in the form of a modest up-front payment together with a royalty arrangement whereby the University would receive a percentage of Cyanamid's sales of prenatal multivitamin products developed using the Doctors' reformulation technology over the life of any patent issued by the PTO, or until Cyanamid ceased producing or otherwise terminated the arrangement. As to the amount of the up-front payment, I find the evidence supports a finding that such payment would have ranged between $50,000 and $150,000, which includes any premium UPI may have extracted from Cyanamid based on its relative sophistication in the field of university licensing and the fact that, at the time, Cyanamid saw significant value in obtaining exclusivity rights necessary to pursue a patent on the reformulation technology and wanted those rights badly. Given the equivocal nature of the evidence suggesting a range from $50,000 to $150,000, I find $100,000 is the appropriate amount for the up-front payment.

In reaching this conclusion, I reject as overreaching both the testimony of Plaintiffs' expert Shannon McCool that the University could have commanded an up-front payment in excess of $ 2 million and the testimony of Cyanamid's expert Atkinson that such payment would have been $0. I am persuaded, however, that exclusivity rights to the reformulation technology were of unique value to Cyanamid, as Cyanamid already enjoyed market position with the Materna tradename and already intended to implement a reformulation within its scope. To the extent those rights ultimately translated into the award of a formal patent, Cyanamid would be positioned to extract even greater rewards because it could reach back and enforce those rights against generic manufacturers and virtually eliminate competition. This, of course, is exactly what transpired.

As to the reasonable royalty rate Plaintiffs could have commanded in 1981, the evidence presented at retrial did not support the 12% rate originally applied in *Cyanamid III*. Rather, the weight of new evidence demonstrated that the usual and customary arrangements at the time of the filing of the patent application in 1981 involved substantially lower royalty rates (but not the ".5% or less" suggested by Atkinson) and that even the relative sophistication of the University (through UPI) and Dr. Allen at the time of the negotiations would not have resulted in a 12% royalty rate being paid for the reformulation technology. I note Dr. Allen had never personally secured more than a 6% royalty rate for any of his patented inventions at the time, nor had UPI secured a

higher rate at the time for the University or any of its other clients.

Nevertheless, considering the long-term relationship and unique value to Cyanamid of the reformulation technology and weighing all of the evidence presented by Plaintiffs' witnesses and experts Alpert, McCool and Rubinfeld against the evidence presented by Cyanamid's witnesses and expert Atkinson, I find the University would have secured a 6% royalty rate on Cyanamid's total aggregate net sales of the reformulated Materna product and successor products reformulated using the Doctors' technology through the life of the Patent, or until the arrangement was otherwise terminated. I arrive at this number, which is at the high end of what Dr. Allen and UPI had negotiated for other inventions/technologies at the time, based both on the testimony of McCool and Rubinfeld regarding the unique opportunity and value the reformulation technology presented for Cyanamid, and my rejection of Atkinson's testimony of what he would have negotiated in the 1981 time frame based on his experience as a licensing negotiator at Harvard. I discounted Atkinson's testimony because he was deliberately instructed not to consider the reality of the relationship between the University doctors and Cyanamid at the time, chose not to interview any of the actual players at Cyanamid or the University, or even to consider that, given the hypothetical assumption that the University *wanted* to sell the technology, that Cyanamid would have been willing to pay at least something to prevent it from selling it to a competitor.

### Royalty Base (Aggregate Net Sales).

Determining the appropriate sales base on which to calculate royalties in this case involves several considerations, including (1) the time frame over which royalties would have accrued; (2) the nature of the sales—i.e., domestic sales only or domestic plus international sales—to be included; and (3) whether Cyanamid's incomplete actual sales figures or IMS sales data should be used. Based on the evidence presented, I find the appropriate start date for any royalty arrangement negotiated in 1981 would have been the date the patent issued, i.e., 1984. I find 1994 to be the appropriate end date for purposes of determining the royalty base, as I was unpersuaded by Plaintiffs' evidence that Cyanamid deliberately "tanked" the product after that. I was also unpersuaded that Cyanamid's foreign-sourced international sales would have been included in any royalty base negotiated in 1981, and find the royalty base would include domestic and U.S.-sourced international sales only. As for sales figures, I will use Cyanamid sales figures for any years between 1984 and 1994 in which complete sales data was disclosed to Plaintiffs and IMS data for any years in which it was not.

### Prior Art.

 In awarding damages for fraud, I reject Cyanamid's argument that these damages should be zero because the '634 Patent was ultimately rendered valueless by virtue of "prior art." Besides being sublimely self-serving, the argument is simply not salient. At issue is the value, to Cyanamid, of securing an assignment of exclusive rights to the University Plaintiffs' reformulation technology in 1981. Clearly Cyanamid was not aware at the time it filed its patent application or during the time in which the application was pending of any potentially invalidating prior art or it would have been committing fraud on the PTO in pursuing it. The amount it would have paid to obtain a license/assignment and to secure the Doctors' cooperation in filing the necessary patent application documents would therefore have been the same whether such prior art existed at the time or not.

I note that for the purposes of this litigation, Cyanamid never pled the invalidity of the '634 Patent as an affirmative defense and emphatically argued, throughout this litigation until shortly before the damages retrial, that the Patent was valid and enforceable. The prior art search and documents to which Cyanamid now points as evidence of the Patent's invalidity have been in the possession of Cyanamid for years, years in which Cyanamid simultaneously insisted to this Court and at least five others that the Patent was valid and rightfully Cyanamid's. Cyanamid realized substantial benefit from enforcing the Patent against competitors during this time period, and is estopped from challenging the validity of the Patent by raising the specter of prior art now.

### III. *PUNITIVE DAMAGES.*

■ Based on the findings of fact and conclusions of law reiterated and supplemented in my liability determination on remand, I ordered the punitive damages award of $500,000 each to Drs. Allen and Seligman "vacated," with a "new amount" to be assessed against Cyanamid in their favor after the damages retrial. *Cyanamid IV*, 105 F.Supp.2d at 1185. After considering the parties' respective arguments in their briefs, I am persuaded that the $500,000 punitive damage amounts should be re-entered on remand. The original award was premised not on the amount of actual damages sustained by the Plaintiffs, but "on Cyanamid's cynical disregard of these doctors as scientists" and its conduct, "[w]hen [it] recognized the profit that could be made," in "pillag[ing] the doctors' invention as so much booty." *Cyanamid III*, 974 F.Supp. at 1358. There is no

basis to increase the punitive damage award to the Doctors for this misconduct because there was no additional evidence taken at the damages retrial with respect to it.[7]

Accordingly, Cyanamid will again be ordered to pay the Doctors $500,000 in punitive damages each, an amount which is intended to punish Cyanamid for its conduct in exploiting these doctors—both personally and as scientists—for its own gain.

### IV. *EQUITABLE RELIEF—UNJUST ENRICHMENT.*

■ The question of whether both legal and equitable remedies can be awarded in this litigation and, if so, the extent to which they overlap has been raised in *Cyanamid III* and *IV*, with no supervening directions from the Federal Circuit on appeal. The question remains open, and I address it below.

#### *Overview.*

I agree with Cyanamid that there can be no disgorgement of profits as a measure of actual damages in this case. Once it is assumed in a hypothetical that the University would have sold Cyanamid exclusivity rights in the Doctors' invention, any profits generated as a result of those rights would belong to Cyanamid and could not be considered a "loss" to Plaintiffs. I also agree with Cyanamid that there can be no disgorgement of profits to remedy that aspect of its unjust enrichment liability that simply says it would be inequitable for Cyanamid to retain the consideration it should have paid the University in the hypothetical 1981 transaction. This "remedy"

---

7. Plaintiffs' request for attorney fees and costs and concerns regarding Cyanamid's late production of the Record of Invention, suppression of documents in the first trial, "obdurate" behavior in discovery, and litigation misconduct, generally, will be addressed in

the context of Plaintiffs' Motion for Sanctions, filed November 21, 2000 and supplemented on June 7, 2001, and will not be considered as evidence justifying an increased exemplary damages award.

would arise any time an award of damages is ordered, and is obviated by the payment of those damages.

The issue, however, does not end there. The gravamen of this case is that the Doctors never viewed the reformulation idea as a financial opportunity and neither they, nor the University by virtue of the University Patent Policy, ever intended to or would have sold exclusivity rights to the idea to Cyanamid in 1981. The evidence and my findings in this regard in *Cyanamids III* and *IV* were uncontroverted and unequivocal: Drs. Allen and Seligman wanted to present their studies and re-search-based reformulation concepts to the marketplace of ideas by publishing them in the most prestigious medical journal that would accept them. In doing so, they fully intended that Cyanamid would use their work to manufacture, and profit from the sale of, an improved Materna product. *But they also intended* that other manu-facturers of prenatal multivitamin products in the marketplace would do the same. *Cyanamid III,* 974 F.Supp. at 1354 (find-ing Cyanamid removed reformulation tech-nology from free marketplace of ideas "in direct contravention of those who invented it"); *Cyanamid IV,* 105 F.Supp.2d at 1184 (reiterating that Cyanamid "thwarted what the Doctors intended 'freely' to convey, [namely] a complete and definite research-based idea for reformulating prenatal sup-plements that would inure to the benefit of all . . . not just Cyanamid").

In what I specifically found to be a "cynical disregard of these doctors as sci-entists," *Cyanamid III,* 974 F.Supp. at 1358, Cyanamid consciously thwarted this intent by falsely claiming it was Dr. Ellen-bogen who invented the reformulation technology and then acting secretly to se-cure, by patent, the right to exclude others

from using it. Cyanamid's actions were motivated by greed and a desire for the greater profits anticipated by the securing of exclusive, rather than general, rights to the technology, in direct contravention of what the Doctors wanted and intended. The harm to Plaintiffs of this conduct— i.e., the betrayal and the loss of the Doc-tors' prerogative as scientists, and the University's prerogative as a research in-stitution intent on supporting, rather than exploiting, its faculty, to determine wheth-er their research and reformulation con-cepts entered the marketplace of ideas generally or are sold to become the exclu-sive and profit-generating intellectual "property" of another—is not quantifiable in terms of specific monetary loss, as it had to be presumed away to determine Plaintiffs' damages under the hypothetical described above. Accordingly, there is an entire aspect of the harm visited by Cyan-amid's misconduct not remediable by an award of damages.

What remedy, then, for an inventor de-prived of his prerogative *not* to patent,[8] or to refuse to allow another to patent, his invention? What consequence for an enti-ty who took for itself the rewards of patent when it was not the true inventor? It is here that principles of equity find their place, and here that a benefits-based anal-ysis becomes appropriate.

### *Preliminary Findings and Conclusions—Disgorgement.*

In *Cyanamid IV,* I applied federal pat-ent standards of inventorship in accor-dance with the Federal Circuit's mandate and again found Cyanamid was unjustly enriched by the taking of exclusivity rights that were rightfully Plaintiffs'. At issue now is the nature and scope of an appro-priate remedy for Cyanamid's misconduct. I have already rejected Cyanamid's argu-

---

**8.** As stated in *Cyanamid IV,* the patenting of an idea is an exception to the rule that "ideas in the public domain inure to the good of society." 105 F.Supp.2d at 1175. Clearly there is no *requirement,* then, that all patenta-ble ideas actually be patented.

ment that Plaintiffs' failure to appeal my finding that there was insufficient evidence in *Cyanamid III* to justify an order requiring Cyanamid to disgorge the benefits it received precludes them from seeking such a remedy on remand. Damages evidence was reopened on remand—largely at Cyanamid's request—and additional discovery was allowed. Thousands of pages of profits and sales documents were produced by Cyanamid for the first time on remand. This new evidence, together with the testimony of numerous additional fact and expert witnesses presented for the first time by both sides at the retrial, was sufficient to allow for the quantification of value/profits realized by Cyanamid attributable to the wrongfully obtained and enforced '634 Patent.

### Colorado Law Allows for the Award of Both Legal and Equitable Remedies under the Circumstances Presented.

As set forth above, the Federal Circuit recognizes that Colorado law governs the claim for unjust enrichment in this case, as long as federal patent standards of inventorship are applied in determining liability. 196 F.3d at 1374 (citing *Cablevision,* 649 P.2d 1093). Contrary to Cyanamid's contention on remand, there is clear support in Colorado law for a benefits-based approach to effecting equitable relief in ap-

propriate cases. *See EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.,* 900 P.2d 113, 118 (Colo.1995)(en banc)(adopting case-by-case approach to determining whether profits may be awarded as restitution in unjust enrichment action).[9] This is true even if it results in plaintiff receiving a greater reward than if simply awarded damages for the defendant's misconduct:

> Restitution, which seeks to prevent unjust enrichment of the defendant, differs in principle from damages, which measure the remedy by the plaintiff's loss and seek to provide compensation for that loss. As a consequence, 'in some cases the defendant gains more than the plaintiff loses, so that the two remedies may differ in practice as well as in principle.'

*EarthInfo,* 900 P.2d at 118 (quoting Dobbs, *Law of Remedies* § 4.1(1) at 555, 557).

No easy formulas exist for determining when restitution of profits realized by a party is permissible. *EarthInfo* at 119. Because it is an equitable remedy, it is within the trial court's "sound discretion" to fashion. *See id.* As the Colorado Supreme Court in *EarthInfo* envisioned it, in determining whether restitution of profits/disgorgement is appropriate in a given case,

---

**9.** That *EarthInfo* arose as an action for rescission of a contract, rather than fraud, is immaterial in my view because the contractual nature of the parties' relationship did not inform the Colorado Supreme Court's analysis. The claim in that case sounded in equity, and the nature of the remedy sought, i.e., a return to the *status quo ante* when a return of plaintiff's monetary losses were inadequate to do so, was also equitable. 900 P.2d at 118–19. At issue were the means available to a trial court judge to effect that remedy and, according to the Court, one of those is to require the defendant to give up his profits. *Id.* at 119. The nature of the defendant's wrong was irrelevant, as evidenced by the Court's citation to *Duke v. Pickett,* 168 Colo. 215, 451 P.2d

288 (1969)(rescinding sales transaction consummated through fraud) and its use of an example involving theft to explain why "restitution measures the remedy by the defendant's gain." *Id.* at 118, n. 8(" 'Suppose a thief takes the plaintiff's $10 watch and sells it for $20. The thief is liable for $20 as restitution ....' ")(quoting 1 Dan B. Dobbs, *Law of Remedies* § 4.1(1) at 554 (2d ed.1993)). Supposing a pharmaceutical company takes a researcher's $10 idea and, by fraudulently securing exclusivity rights to it, earns profits of $20, *EarthInfo* would support a conclusion that the wrongdoer is liable for $20 as restitution, even though plaintiff only lost $10.

courts must resort to general considerations of fairness, taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest [citing 1 George E. Palmer, *The Law of Restitution* § 2. 12 at 161 (1978) ]. Thus, the more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits [citing Douglas Laycock, *The Scope and Significance of Restitution,* 67 Tex. L.Rev. 1277, 1289 (1989) ]. The trial court must ultimately decide whether the conclusion that the defendant's retention of any profit is unjust.

*EarthInfo,* 900 P.2d at 119.

Based on my findings of liability and the extreme culpability of Dr. Ellenbogen and Cyanamid in 1981, and continuing throughout the pendency of the patent application and thereafter, together with the wealth of new evidence establishing that Cyanamid realized substantial value in the form of exclusivity-based profits as a result of its misconduct, I find and conclude that Cyanamid's retention of those profits would be unjust and that Cyanamid should be ordered to disgorge them. My analysis in this regard was informed by my knowledge and review of Colorado law and the persuasive testimony of Plaintiffs' expert, Professor Daniel Rubinfeld, at the damages retrial. The remedy is separate and independent from Plaintiffs' remedy at law, in that it is premised on the benefits realized by Cyanamid as a result of its misconduct, rather than the University's demonstrated financial loss. The remedy is subject, of course, to the principle against double recovery, which will be addressed separately below.

Having determined that disgorgement of profits is appropriate under the guidelines established under Colorado law, I must determine the amount of the profits to be returned in this case given the facts established. The Colorado Supreme Court in *EarthInfo* acknowledged that " 'some apportionment' " of net profits should be made to reflect the relative contributions to those profits by the parties. 900 P.2d at 120 (quoting Dobbs, § 4.5(3) at 642–43) ("[S]ome apportionment must be made between those profits attributable to the plaintiff's property and those earned by the defendant's efforts and investment, limiting the plaintiff to the profits fairly attributable to his share.").[10]

---

10. Cyanamid cites *EarthInfo* for the proposition that plaintiffs bear the burden of establishing facts sufficient to permit the trial court to determine the relative contributions of the parties so that profits may be fairly apportioned. (Reply Br. of Def. Cyanamid in Support of Mot. re Appropriate Scope of Damages Trial on Remand at p. 6 (citing *EarthInfo* at 121)). The Court in *EarthInfo* makes clear, however, that where apportionment depends on information to which "defendant usually has the best access ... [defendant] may properly be required to prove such [information]" to aid the trier of fact in the apportionment of profits. *EarthInfo* at 120. In sum, "[n]o single rule governing the burden of proving apportionment is adequate for all cases or all facts of a single case." *EarthInfo,* 900 P.2d at

120. "The court must seek to determine a fair apportionment that will result in a reasonable approximation or informed estimate of the relative contributions of the two parties." *Id.* at 121 (citing Palmer, § 2.13 at 171–73; Dobbs § 4.5(3) at 643). "The allocation of the burden of establishing such approximation, and degree of specificity of proof required, may be affected by such factors as the seriousness of the defendant's wrongdoing and the extent to which plaintiff's contribution was at risk in the profit making enterprise." *Id.* The dispute is largely academic in this case, however, as the evidence presented by Plaintiffs by and through Professor Rubinfeld was adequate for the determination required.

Professor Rubinfeld ably addressed this issue, performing an analysis that calculated only those true profits, i.e., sales less production and marketing/distribution costs, of Cyanamid that were attributable to the right to exclude generic competition. Rubinfeld Test. (Trial Tr., Vol. V) at pp. 652–668; Rubinfeld Report, (Ex. 843) at pp. 5–8. Specifically, Rubinfeld calculated Cyanamid's patent-related profit in terms of Materna sales, from 1984 to 1994, less Cyanamid's production and marketing/distribution costs, and compared them with the sales of co-industry leader Stuartnatal's unpatented product, Stuartnatal 1 + 1, less production and marketing/distribution costs, over the same period of time. Using a patent period from 1984–94, Dr. Rubinfeld concluded the value of the '634 Patent in excluding generic competition and suppressing substitution was $27.2 (using IMS data) or $23.2 million (using internal Cyanamid data). I found Professor Rubinfeld's analysis competent and his presentation persuasive. His final number is conservative, moreover, in that it does not attempt to quantify additional profit attributable to the trademark, promotional or door-opening values of the Patent, each of which I found to have been amply demonstrated by the evidence.

I find Cyanamid was unjustly enriched by its conduct in taking for itself exclusivity rights in the Doctors' reformulation technology and then secretly patenting that technology without the Doctors' or University's knowledge or consent. This taking not only deprived the University of the financial gain it could have realized had Cyanamid paid for an exclusive license or assignment of rights and filed its patent application above board, but also betrayed the Doctors and deprived both them and the University of their prerogative *not* to patent the Doctors' invention or to exclude others from benefitting from it. The profits Cyanamid earned by virtue of its possession and enforcement of the wrongfully secured Patent are the direct result of that misconduct. Those profits constitute ill-gotten and undeserved gains for which Cyanamid did not pay and would not have received, because the rights that generated them would never have been sold. In an exercise of my authority under Colorado law to effect equity in the face of the exceedingly culpable conduct at issue in this case, I order those gains disgorged.

### Overlap between Equitable and Legal Remedies in this Case.

■ I have already identified the dilemma that arises when a defendant is found liable to a plaintiff under both legal and equitable theories of relief. *See Cyanamid III*, 974 F.Supp. at 1359, *Cyanamid IV*, 105 F.Supp.2d at 1184–85. The issue is complicated in this case when one begins with the determination of the price Cyanamid "would have" paid for exclusivity rights in 1981 assuming Plaintiffs would have sold them. Once one accepts the premises necessary to the hypothetical, the logical extension of them is that the legal and equitable remedies "coincide." *See id.* Having paid for those exclusivity rights in an arms-length transaction, any profits generated by those legitimately procured rights would be Cyanamid's to keep and not a "loss" to Plaintiffs at all.

I have already determined, however, that the hypothetical necessary to the damages calculation fails to include two fundamental elements of the injury visited upon Plaintiffs: (1) Dr. Ellenbogen's theft of the Doctors' invention and duplicity in keeping that theft from the Doctors while they continued to perform work for Cyanamid; and (2) the deliberate thwarting of the Doctors' intent that their research technology be "owned" by no one. The damages calculation driven by the hypothetical, then, does not compensate Plaintiffs for the full scope of their injuries and the equitable and legal remedies imposed

do not coincide. That does not mean, however, that they do not overlap.

Fundamental to any remedial scheme is the proposition that a plaintiff generally may not recover twice for the same injury. *E.g. MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express, Inc.,* 962 F.2d 1470, 1473 (10th Cir.1992). In the instant case, I find the principle against double recovery would preclude an award to Plaintiffs both of the hypothetical price Cyanamid would have paid for exclusivity rights in 1981 *and* the gain Cyanamid realized as a result of its fraudulent and inequitable conduct because, under normal circumstances, the price paid for exclusivity rights should serve to compensate an inventor for the purchaser's future profits. Here, however, the hypothetical purchase price does not serve fully to compensate Plaintiffs both because an entire aspect of the harm visited by Cyanamid is not included in that calculation and, as it turns out, the evidence clearly establishes that Cyanamid's gain as a result of its misconduct is greater than the losses established by resort to a less-than-comprehensive hypothetical. Under these circumstances, Colorado law recognizes my prerogative, in equity, to compel Cyanamid to disgorge that gain.

Plaintiffs' remedy on their fraud and unjust enrichment claims, then, can be quantified in terms of the price the University could have commanded in the hypothetical 1981 transaction for exclusivity rights *plus* the difference between Cyanamid's ensuing profits less that purchase price, or, simply, Cyanamid's patent-related profits. Either calculation compensates Plaintiffs for the full panoply of their injuries and takes into consideration the principle against double recovery.

### V. CONSTRUCTIVE TRUST.

Plaintiffs on remand present the interesting argument that their success on the revived patent correction and equitable title claims should entitle them to additional equitable remedies in the form of a constructive trust. While I question the applicability and utility of the duties-of-a-fiduciary analogy, I view it as an alternative to the disgorgement theory already adopted in equity. Specifically, I agree that Plaintiffs' status as the equitable title holders to the '634 Patent from 1984 forward constitutes a separate and independent ground for requiring Cyanamid to disgorge to them the profits it unjustly gained as the putative holder of the Patent. I deny, however, Plaintiffs' request for the imposition of a constructive trust on Cyanamid's patent-related profits based on any analogy that Cyanamid stood as a fiduciary to Plaintiffs during the course of its possession of the Patent.

### VI. PREJUDGMENT INTEREST.

■ Colorado's prejudgment interest statute provides in relevant part:

When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever occurs first.

Colo.Rev.Stat. § 5–12–102 (2000). Prejudgment interest in this case shall be calculated at a rate of eight percent per annum, compounded annually.

### VII. CONCLUSION.

On or before August 23, 2001, Plaintiffs shall prepare a set of proposed findings of fact and conclusions of law consistent with the preliminary rulings set forth herein. The proposed findings should be declarative and supported by specific and complete citations to the record. The proposed conclusions of law should be ob-

jectively analytical and in keeping with my preliminary rulings. This is not an assignment in advocacy and extensive briefing and argument on the proposed findings and conclusions will not be entertained. Within 20 days after the date of filing of the proposed findings of fact and conclusions of law, Defendant may file specific objections with complete citations to the record. A hearing on Plaintiffs' Motion for Sanctions and Supplement will be set within 30 days after the Findings of Fact and Conclusions of Law are formally issued.