The UNIVERSITY OF COLORADO FOUNDATION, INC., et al.,
Plaintiffs,

v.

AMERICAN CYANAMID COMPANY, a Maine corporation, Defendant.

No. CIV.A. 93–K–1657.

United States District Court,
D. Colorado.

Aug. 13, 2002.

See also 153 F.Supp.2d 1231.

Harold A. Haddon, Saskia A. Jordan, Ty Cheung Gee, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Glen K.

Beaton, Gibson, Dunn & Crutcher, Robert N. Miller, Frederick Thomas Winters, Stephanie Erin Dunn, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Denver, CO, for plaintiffs.

Roger P. Thomasch, Ballard, Spahr, Andrews & Ingersoll, LLP, Mark A. Wielga, Temkin, Wielga & Hardt, L.L.P., Denver, CO, Paul A. Ramundo, Donovan Leisure Newton & Irvine, Richard J. DeMarco, Jr., Reed, Smith, Shaw & McClay, Daniel J. Thomasch, Lauren J. Elliot, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DAMAGES AND EQUITABLE REMEDIES ON REMAND

KANE, Senior District Judge.

This matter is before me for the issuance of final Findings of Fact and Conclusions of Law on the issue of damages and equitable remedies available to Plaintiffs after my determination, on remand, that Plaintiffs were entitled to the re-entry of judgment in their favor and against Defendant on Plaintiffs' claims for fraud and unjust enrichment. *See University of Colorado Found. v. American Cyanamid Co.,* 105 F.Supp.2d 1164 (D.Colo.2000)(*Cyanamid IV*)(bifurcating liability and remedies issues and ordering a reopening of evidence and retrial on latter), *on remand from University of Colo. Found., Inc. v. American Cyanamid, Co.,* 196 F.3d 1366 (Fed.Cir.1999).[1] Preliminary rulings in-

tended to edify the drafting of proposed final findings and conclusions on remand were set forth in *University of Colo. Found., Inc. v. American Cyanamid Co.,* 153 F.Supp.2d 1231 (D.Colo.2001) (entitled Preliminary Opinion to Guide Findings of Fact and Conclusions of Law (" 'Preliminary Opinion' or *Cyanamid V*")). Having carefully reviewed Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Defendant's Objections thereto and Alternative Calculations, Plaintiffs' Corrected Proposed Findings of Fact and Conclusions of Law and Response to Defendant's Alternative Calculations, Defendant's Response to Correction to Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Plaintiffs' Supplemental Authority, and Defendant's Response to Plaintiff's Supplemental Authority, the following constitute my Findings of Fact and Conclusions of Law with respect to the remedies to be afforded Plaintiffs for Defendant's fraud and unjust enrichment:

## I. STANDING.

I reiterate my finding from the 1996 trial that each of the Plaintiffs has standing to pursue claims against Cyanamid. *See Cyanamid III,* 974 F.Supp. at 1353.

## II. PROCEDURAL HISTORY, APPELLATE WAIVER, LAW OF THE CASE, AND VIABILITY OF THE REMEDY OF DISGORGEMENT ON REMAND.

With respect to my recitation of the procedural history of this case and rulings

---

1. Earlier decisions in this timeworn tale can be found at *University of Colo. Found., Inc. v. American Cyanamid,* 880 F.Supp. 1387 (D.Colo.1995)(rejecting, as a matter of law, Plaintiffs' common law claim of conversion as well as Plaintiffs' claim for correction of patent, but finding Plaintiffs had standing to pursue claims for equitable title/relief under Patent Act)(*Cyanamid I*); *University of Colo. Found., Inc. v. American Cyanamid Co.,* 902 F.Supp. 221 (D.Colo.1995)(on reconsideration

of *Cyanamid I,* agreeing with Cyanamid that Plaintiffs' equitable title claim must fall with claim for patent correction under Act)(*Cyanamid II*); *University of Colo. Found., Inc. v. American Cyanamid Co.,* 974 F.Supp. 1339 (D.Colo.1997)(finding in favor of University Plaintiffs and against Cyanamid on Plaintiffs' claims for fraud and unjust enrichment and awarding approximately $45 million in damages)(*Cyanamid III*).

on the issues of appellate waiver, law of the case, and viability of the remedy of disgorgement on remand, I refer to pages 1231—1237 of *Cyanamid V* and related pages 1172—73 of *Cyanamid IV.* Despite their best efforts, the parties' attempts to paraphrase my analysis and rulings in the Corrected Proposed Findings of Fact and Conclusions of Law and objections thereto include subtle—and sometimes not-so-subtle—"spin" that risks creating unintended distinctions between my analysis in these introductory sections of the Preliminary Opinion and any characterization of it as "final" Findings and Conclusions here. The issues of appellate waiver, law of the case and the viability of disgorgement as a remedy after remand are legal ones, and my analysis of them in *Cyanamids IV* and *V* speaks for itself. Rather than providing these enduring combatants with the means of creating additional and unnecessary grounds for appeal, I simply refer to my previous analysis and decline to create the legal ambiguities the parties' submissions invite.

## FINDINGS OF FACT REGARDING FRAUD DAMAGES.

### Substantial Value to Cyanamid of Exclusive Rights in the '634 Patent.

1. I find beyond any doubt that Cyanamid, in 1981, saw substantial value in the reformulation ideas conceived by the Doctors in Studies IA and II and IIA and refined in Studies III and IV. Tr. at 593, 598 and 605 (Rubinfeld testimony); Exs. 114 ("this is the most important thing we have done"), 225 (discussing Cyanamid's pre-patent preparations to enforce the '634 Patent against generics), 245; McCool Tr. at 243, 254–255 and 258–259; Damson Tr. (5/14/96) at 1485–88. Whether these ideas are referred to as "the reformulation technology" or "the '634 [Patent] technology"

is immaterial, as the terms are interchangeable. *See Cyanamid IV,* 105 F.Supp.2d at 1180–81 (rejecting Cyanamid's attempts to characterize the scope of the invention patented as being broader than the reformulation technology conceived by the Doctors, and concluding they were one and the same).

2. Cyanamid announced the reformulation of Materna on October 14, 1981 (Ex. 174) and within days, Dr. Ellenbogen and Cyanamid's in-house patent counsel R.P. Raymond were circulating a proposed patent application on the reformulation technology. Ex. 178. Cyanamid's Application for Letters Patent, 28,776 (Ex. 189A, *see also* Ex. 234), signed by Dr. Ellenbogen and including the tables and figures cut, pasted and photocopied from the Doctors' New England Journal of Medicine article manuscript, was filed on or about December 10, 1981.

3. Cyanamid saw value in getting the patent filed before the end of the year. A December filing would secure a 1981 trigger date for future enforcement actions against generic manufacturers of prenatal vitamin formulations within the patent's scope. Cyanamid appreciated this value, as evidenced by a September 1983 internal memorandum explaining that, because the Materna patent was submitted in December 1981, "[a] generic is in violation of our patent unless the product was on the market prior to December 1980." (Ex. 225)

> Since [sic] reformulated Materna was introduced in October 1981, no generic companies would have been copying our present formula until after the October 1981 introduction. Therefore [assuming the patent is issued], it is assumed that all generic Materna formulas are in violation of our patent.

*Id.* It is a reasonable inference from these facts that Cyanamid appreciated the value of a 1981 filing date when it introduced

reformulated Materna in 1981, and would have come to any negotiations with UPI or Dr. Allen to secure exclusive rights to the Doctors' reformulation technology strongly motivated to secure them before the end of the year.

4. The "big advantage" of patent protection is the elimination of "direct generic competition." Rubinfeld Test., Tr. at 614. Additional value results from the marketing gains associated with the reduction or elimination of "leakage," i.e., revenue lost as a result of the substitution by pharmacists of generics for brand name products that are not patented. Rubinfeld Test., Tr. at 592–596. Substitution rates for unpatented brand-name · prenatal vitamin products is 50% (or higher) such that marketing dollars spent promoting those products yield correspondingly low returns, i.e., 50 cents on the dollar or less. See id., Tr. at 592, 594–595, 616–617; Ex. 732 at A063871 (substitution rates for Stuartnatal "historically 60% and currently close to 50%"). I find Cyanamid appreciated these aspects of value in 1981 when it filed its patent application, and they would have strongly influenced any negotiations it had with UPI and Dr. Allen for exclusive rights to the invention in 1981.

5. The damage award in *Cyanamid III* was "the reasonable royalty Plaintiffs could have expected had they assigned or transferred exclusive rights to the reformulation to Cyanamid." *Cyanamid III*, 974 F.Supp. at 1357. The only evidence presented at the 1996 trial on the question

of reasonable royalty were royalty rates and sales figures data offered by Plaintiffs. *See Cyanamid V*, 153 F.Supp.2d at 1237–38 (quoting *Cyanamid III*) Accordingly, I applied the 12% royalty rate to the aggregate sales figures presented by Plaintiffs to award Plaintiffs $44,396,159, which included prejudgment interest.

6. On Cyanamid's Motion and over Plaintiffs' objection, evidence on the question of damages and equitable remedies was reopened on remand. *Cyanamid V* at 1235–36. Post-remand discovery was vigorous, with the parties exchanging tens of thousands of pages of documents. *Id.* As a result, substantial additional evidence on royalty rates, sales figures and licensing arrangements projecting them into the future was received at the 2001 damages retrial. *E.g.,* Tr. Testimony of Messrs. Alpert, McCool Atkinson, and Dr. Allen; Exs. 752 (Materna foreign sales 1995–2000), 1870 (Materna documents reflecting domestic sales and cost deductions for 1978–2000), 1945 (Univ. Colorado Licenses and Sub-licenses), and 1946 (Licenses Negotiated by University Patents, Inc.).

### Licensing Sophistication of the University and Dr. Allen in the early 1980's.

7. As the Federal Circuit in its opinion on appeal recognized, university licensing of faculty inventions was in its nascent stages in 1981. *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 196 F.3d 1366, 1374 (Fed.Cir.1999).[2]

---

2. The Federal Circuit also noted that "the Bayh–Dole Act, which set the stage for modern university licensing, went into effect less than six months before the '634 patent's filing date." 196 F.3d at 1374 (citing 35 U.S.C. § 200 (1994)). While it is of little import in this case where my findings, specifically, are that the University of Colorado was ahead of the curve and had more experience than most universities of that era in patenting and li-

censing the intellectual property of its faculty researchers in 1981, I note that the Bayh–Dole Act did not apply to the type of research in which Drs. Allen and Seligman were engaged when they developed the '634 Patent technology. Not only did the Doctors' invention predate the Act's effective date, but also the Act applies only to inventions arising from federally funded research and development.

At the time of the hypothetical negotiations in this case, however, I specifically find that the University and Dr. Allen were more experienced than most universities and faculty researchers in patenting and licensing intellectual property.

8. Beginning in the late 70's, the University had a contract with University Patents Inc. ("UPI"), a publicly traded, for-profit corporation that specialized in representing universities, research laboratories and professional inventors to commercialize the inventions and intellectual property they generated. Alpert Tr. at 71–72, McPike Depo. at 134, Atkinson Tr. at 1715. UPI was founded and run by former patent attorneys who were sophisticated and well qualified to exploit the commercial potential of work conducted by University researchers. Alpert Tr. at 70–74, 92–95. Pursuant to its contract with the University, UPI was to license and commercially exploit University-generated intellectual property. Exs. 13 (April 1976 Servicing Agreement); 141 (May 1981 Servicing Agreement) and 272 (July 1986 Servicing Agreement); Siegel Depo. at 22–23; Alpert Tr. at 75–77; McCool Tr. at 240; Caruthers Tr. at 2323–2324; Allen Tr. at 941.

9. In 1981, Dr. Allen had already had experience patenting and commercially exploiting his inventions, and continued to do so through the 1980's and 90's. Atkinson Tr. at 1758; Allen Tr. at 956–957, 970–971, 980–981, 995–996, 998–999, 1001, 1010, 1023, 1059; Alpert Tr. at 91–92; Exs. 508, 510, 516, 828, 1549, 1550, and 1676. Beginning in 1980, Dr. Allen patented seven of his inventions, Ex. 1722, three of which resulted in six commercial licenses in the early to mid–1980's. Exs. 508, 510, 516, 828, 1549, and 1550. *See* Exs. 28 (Vitamin B12 patent application), 42, 43, 83, 90 (Reticulocytes patent application), 95 (Patent regarding Vitamin B12), 508 (September 1980 Corning Glass Works license), 510 (January 1981 Amersham International license), 516 (December 1981 Corning Glass Works license), 828 (July 1982 Diagnostic Products license), 829 (January 1991 Microgenics Corporation license), 1549, 1550 (September 1984 Bio–Rad Laboratories license), 1594 (July 1994 Microgenics Corporation license), 1676 (1978 invention disclosure regarding Vitamin B12).

10. I find that Mr. Alpert, a former IBM and General Electric patent attorney in the late 1960's and early 1970's and the President of UPI in the early 1980's, was credible and knowledgeable about the licensing practices of the University (as well as other universities) during the relevant 1981 time period. While I did not find Cyanamid's expert Mr. Atkinson lacking in general knowledge of the relevant period in the industry, I discounted his testimony because he did not consult with any of the individuals who were familiar with and would have engaged in any 1981 negotiations between the University and Cyanamid. Moreover, he testified pursuant to instructions from Cyanamid's counsel that did not reflect the realities of the relationship between the University, Dr. Allen and Cyanamid or the University's negotiating position with respect to the '634 patent technology leading up to or during the relevant 1981 time period. Atkinson Tr. at 1753—65, 1775–1779. *See Cyanamid V,* 153 F.Supp.2d at 1240.

11. Cyanamid was aware of UPI's role in the negotiation of licenses regarding University-generated intellectual property. Allen Tr. at 1060; Alpert Tr. at 99–100; Exs. 153 and 194.[3]

35 U.S.C. § 200. No federal funding was associated with the Doctors' research.

3. Similar testimony was also elicited at the 1996 trial.

12. While most universities at that time were naive about the valuation of patents, the University of Colorado had the prudence to obtain outside expertise that more than compensated for its inexperience. That expertise, in the form of UPI, would have recognized on the University's behalf in the early 1980's the significant value of the '634 technology to Cyanamid and/or its competitors at that time. Alpert Tr. at 92.

### Hypothetical License Terms.

#### Up–Front Payment.

13. The negotiations between the University and Cyanamid concerning an exclusive license for the '634 technology would have resulted in payment by Cyanamid of an up-front payment to the University. McCool Tr. at 240; Alpert Tr. at 92–93, 202.

14. I reject as overreaching and unpersuasive both the testimony of Plaintiffs' expert, Shannon McCool, that the '634 technology would have commanded a $2 million up-front payment, McCool Tr. at 244, 292, and Defendant's expert, Stephen Atkinson, that no up-front-payment would have been commanded for the '634 technology. Atkinson Tr. at 1684, 1690, 1697.

15. The evidence presented at trial supports the conclusion that a reasonable up-front payment for the '634 technology would have been in the range of $50,000 to $150,000. Alpert Tr. at 92–93 and 143; Caruthers Tr. at 2308.

16. Therefore, had Cyanamid and the University engaged in negotiations for exclusive rights to '634 technology in 1981, I find the University would have secured an up-front payment for such rights of $100,000 from Cyanamid.

#### Reasonable Royalty.

17. In the hypothetical situation where Cyanamid and the University would have negotiated an exclusive license of the '634 Patent technology in 1981, I find that license would have been based on a percentage of Materna net sales. Rubinfeld Tr. at 647–650. Alpert Tr. at 92–93; McCool Tr. at 241–247.

18. Plaintiffs' expert, Shannon McCool, testified a 12% royalty rate would have been reasonable in 1981 for an exclusive license of the '634 technology to Cyanamid. McCool Tr. at 241–244.

19. Mr. Alpert testified that he would have expected to negotiate at least a 10% royalty rate in 1981 for an exclusive license. Alpert Tr. at 92.

20. Mr. Damson testified that the Plaintiffs would have obtained a 12% royalty in 1981 for an exclusive license. Damson Tr. (5/14/96) at 1482–1485, 1491–1493.

21. Defendant's expert, Stephen Atkinson, testified that the Plaintiffs would have received no more than 0.5% royalty in 1981 for an exclusive license. Atkinson Tr. at 1656–1657.

22. For the reasons set forth at pp. 1239–40 of my Preliminary Opinion, I decline to adopt any one of these experts' hypotheses concerning the reasonable royalty rate that would have been negotiated under the "usual and customary arrangements" that existed between university researchers and manufacturers in the 1981 time period. As previously noted, Mr. Atkinson failed in his analysis to consider either the actual facts that would have informed the hypothetical license negotiations in 1981 or the players who would have participated in them. Atkinson Tr. at 1730–1731, 1753, 1760–1761. Most importantly, Mr. Atkinson refused even to consider, given the requisite assumption that the University would have wanted to sell the technology, that Cyanamid would have been willing to pay at least something to prevent the University from selling the

technology to a competitor. Atkinson Tr. at 1742, 1760, 1799. On the other hand, the evidence also established that Dr. Allen, in the 1981 timeframe, had never secured more than a 6% royalty rate for any of his inventions, nor had UPI secured a rate higher than 6% for the University or any of its other clients. *Cyanamid V,* 153 F.Supp.2d at 1239–40. These facts cast doubt on the projections of Messrs. McCool, Alpert and Damson as to the size of the royalty rate the University could reasonably have expected for the '634 Patent technology in 1981.

23. Considering the "usual and customary arrangements" that existed between university researchers and pharmaceutical companies generally in the 1981 time period, the actual relationship as it existed between Dr. Allen, the University, UPI and Cyanamid, and considering the unique value to Cyanamid of securing exclusive rights to the '634 Patent technology, and weighing all of the evidence presented by the fact and expert witnesses identified above, I find that in 1981, the University and Cyanamid would have negotiated a 6% royalty rate for an exclusive license of the '634 technology.

### Royalty Payment Start Date.

24. The start date for the payment of royalties by Cyanamid to the University for an exclusive license to the '634 technology would have been February 14, 1984, the date of the issuance of the '634 Patent. *See* Ex. 234A.

### Royalty Payment End Date

25. As set forth at page 1240 of the Preliminary Opinion, I was unpersuaded by Plaintiffs' evidence that Cyanamid deliberately "tanked" Materna after that date such that it should reasonably be held to a standard of having continued to pay royalties through the life of the patent even though Cyanamid, itself, derived no benefit from the patent after 1994. Given that all of the licenses about which there was testimony at trial included a termination provision, it is reasonable to assume a University–Cyanamid license would have included such a provision and that Cyanamid would have terminated the license at the end of 1994. Accordingly, I find the appropriate end date for the calculation of royalties would have been December 31, 1994.

### Royalty Sales Base.

26. Considering the totality of the testimony of Messrs. Rubinfeld, McCool and Atkinson at trial, the exhibits offered and received through them, the deposition testimony of Mr. McPike and the arguments of counsel, I find the royalty sales base of Materna to which the hypothetical 6% royalty rate would have applied would have included domestic as well as U.S.-sourced international sales of Materna. *E.g.,* Rubinfeld Tr. at 648; Ex. 752; McPike Depo. at 135–136. *See Cyanamid V,* 153 F.Supp.2d at 1240.

27. The computation of U.S.-sourced international sales figures is problematic given Cyanamid's failure or inability to produce foreign sales data for Materna before 1995.[4] The parties devoted considerable time and energy at trial and in supplemental materials arguing the reliability and use of IMS Global Health Care ("IMS") sales data to calculate these figures. *See* Pls.' Corrected Proposed Findings and Conclusions (accepted for filing

---

4. In my Preliminary Opinion, I wrote actual Cyanamid sales figures would be used for any years between 1984 and 1994 in which such data was disclosed to Plaintiffs, and IMS figures would be used for any years in which they were not. *Cyanamid V* at 1240. Because no actual sales data were provided for the relevant time period, I have no choice but to use the IMS numbers.

Nov. 7, 2001) and Cyanamid's Response to Correction to Pls.' Proposed Findings and Conclusions, etc. (filed Nov. 19, 2001) at pp. 2–6.

28. IMS Global Health Care ("IMS") is a company that collects pharmaceutical industry data and resells it to pharmaceutical companies in many different forms. McCool Tr. at 297. IMS collects and resells data concerning both domestic and foreign sales of pharmaceutical products including Materna. McCool Tr. at 315.

29. The dispute as it has developed through trial and since is the appropriateness of Plaintiff's expert McCool's reliance on IMS *trade-level* data to calculate Cyanamid's U.S.-sourced international sales figures rather than IMS *"ex-manufacturer"* level data that Cyanamid says more accurately represent actual sales revenue to the manufacturer. Trade-level IMS data reflects revenues received by the wholesaler, and, Cyanamid maintains, overstates revenues actually received by the manufacturer by 5–7%. Cyanamid then concludes that I should reduce McCool's numbers for U.S.-sourced foreign Materna sales by 7%. Cyanamid's Objections to Pls.' Proposed Findings & Conclusions at p. 30. At trial, McCool conceded IMS trade-level data is typically 5–7% higher than IMS ex-manufacturer level data, but explained that, because of prompt-payment incentives and discounts offered by manufacturers, IMS ex-manufacturer data tends to overstate actual revenue by about the same 5–7% margin. McCool, Tr. at 537–39. "[T]he use of trade-level data," McCool concluded, "for practical purposes tends to offset that." Tr. at 539.

30. McCool has substantial work and related professional experience with the use and interpretation of IMS data in the pharmaceutical industry, and I found his testimony on the use of trade-level versus ex-manufacturer level IMS data to calcu-

late actual manufacturer revenues credible. I decline to reduce McCool's U.S.-sourced foreign Materna sales figures by 7%, particularly in light of the fact that it was Cyanamid's failure to produce *actual* sales figures that necessitated resorting to IMS figures in the first place.

31. The appropriate source of domestic net sales of Materna are those figures generated by Cyanamid itself.

## CONCLUSIONS OF LAW REGARDING FRAUD DAMAGES.

32. I have previously found Cyanamid liable to Plaintiffs for fraudulent non-disclosure. *Cyanamid IV*, 105 F.Supp.2d at 1183.

33. Although there is no Colorado law specifically governing how I am to measure damages under the circumstances, the Federal Circuit has instructed that the only proper measure of fraud damages in this case is the "payment that Cyanamid would have made to secure the doctors' cooperation in filing the required documents with the PTO, an assignment of ownership rights and/or an exclusive license from the University." *Cyanamid*, 196 F.3d at 1374. For the present purposes, I conclude the proper approach to measuring damages for fraud is the reasonable royalty the University could have secured in negotiations with Cyanamid in late 1981 for an exclusive license from the University of the '634 Patent technology.

34. In determining the amount of damages, the Federal Circuit has instructed me to consider the "usual and customary arrangements at the time of the filing of the patent application" in December 1981. *Id.*

35. Both Plaintiffs and Cyanamid presented considerable evidence at trial on the issue of the "usual and customary ar-

rangements" in the early 1980's as it would have pertained to royalty negotiations for the '634 patent technology. For example, several expert witnesses testified regarding the issue (Messrs. Damson, McCool, and Atkinson, as well as Dr. Rubinfeld) and hundreds of University/UPI and Cyanamid licenses were submitted at trial. *E.g.,* Exs. 721, 1945 and 1946. While not endorsing all of the testimony and evidence before me, I nonetheless was informed by it in reaching my findings and conclusions regarding the appropriate royalty rate.

36. In determining a reasonable royalty, I considered what would have occurred in a "hypothetical negotiation" for exclusive rights to the '634 patent technology in late 1981. *See, e.g., Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158–59 (6th Cir.1978).

■ 37. A reasonable royalty is determined by considering a hypothetical negotiation between a "willing" licensor and a "willing" licensee. *See, e.g., Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 (Fed.Cir.1995) (en banc); *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 898–901 (Fed. Cir.1986).

38. A hypothetical negotiation employed after litigation assumes that the patent is valid. *See Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.,* 72 F.Supp.2d 893, 902 (N.D.Ill.1999) ("Such a reasonable royalty is determined based upon a hypothetical negotiation between the patent owner and the infringer ... with both parties to the negotiation assuming that the patent is valid. ... "); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 989 F.Supp. 547, 614 (D.Del.1997) (to create "fiction" associated with hypothetical reasonable royalty includes underlying assumption that "patented claims at issue

are deemed unquestionably valid and enforceable."); *accord Schneider (Europe) AG v. SciMed Life Systems, Inc.,* 852 F.Supp. 813, 860 (D.Minn.1994); *Syntex (U.S.A.) Inc. v. Paragon Optical, Inc.,* 7 U.S.P.Q.2D (BNA) 1001, 1027, 1987 WL 124333 (D.Ariz.1987).

39. A hypothetical negotiation should take into account the actual facts as they occurred in the matter both before and after the hypothetical negotiations would occur. *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 698–99, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (referring to later experiences as a "book of wisdom" which can correct uncertainties present at the time of hypothetical negotiation).

■ 40. Based on the findings enumerated above, I conclude that in late 1981, a "reasonable royalty" rate of 6% would have been negotiated by UPI, on behalf of the University of Colorado, with Cyanamid for exclusive rights to the '634 Patent technology. I also find that a license agreement between the parties would have been exclusive and would have included a $100,000 up-front payment, would have been applicable to both domestic and U.S.sourced international sales of reformulated Materna, and would have run from February 14, 1984 to December 31, 1994.

### PRIOR ART.

■ 41. For my findings and conclusions on Cyanamid's argument that Plaintiffs' fraud damages should be zero because the '634 Patent was valueless by virtue of "prior art," I refer generally to the text at *Cyanamid V,* 153 F.Supp.2d at 1240.

42. I note that Cyanamid in this case failed to plead the affirmative defense of "invalidity" or "prior art." *See* Answer dated October 7, 1993, Answer to the First Amended Complaint dated April 1, 1994,

Answer to the Second Amended Complaint dated October 17, 1994, Stipulated Pre–Trial Order dated July 31, 1995 and Amended Stipulated Pre–Trial Order dated February 23, 1996.

43. In December 1981, Cyanamid submitted a patent application to the PTO and, as part of that application, disavowed, under oath, that any invalidating prior art existed. Exs. 189A and 190. Cyanamid submitted a second affidavit in 1983 to the same effect. Ex. 189A, p. 38.

44. In 1984, in part as a result of Cyanamid's application and representations made by Cyanamid to the PTO that no invalidating prior art existed, the PTO issued the '634 Patent to Cyanamid. Ex. 234A.

45. After the '634 Patent issued, Cyanamid asserted its rights under the '634 Patent against at least six generic competitors of Materna through cease and desist letters, injunctive complaints and patent infringement lawsuits. Exs. 245, 519, 520, 523, 527, and 528. In each of these cases brought by Cyanamid to enforce the '634 Patent, Cyanamid alleged that the '634 Patent was valid and legally issued to Cyanamid. Exs. 245, 519, 520, 523, 527 and 528.

46. Since 1984 and through the pendency of this action, Cyanamid has insisted in this court and at least five other federal courts that the '634 Patent was valid and rightfully Cyanamid's. Exs. 519, 520, 523, 527 and 528; see Daniel Thomasch letter to Glenn Beaton dated November 29, 1993 at p. 5, Exhibit D to Plaintiffs' Motion to Compel filed December 15, 1993 ("Cyanamid contends that Dr. Ellenbogen is the only individual that conceived of the invention ... [N]either party is currently alleging that the Patent is invalid ..."). Indeed, as recently as the hearing on Plaintiffs' Motion for Entry of Judgment on February 29, 2000, Cyanam-id argued the '634 Patent was valid and that Dr. Ellenbogen was the true and sole inventor of the '634 technology. *See generally* Transcript of February 29, 2000 hearing on Plaintiffs' Motion for Entry of Judgment at 25–47.

47. Cyanamid is estopped from arguing that the '634 Patent is invalid as a factor to be considered in determining the value, to Cyanamid, of the '634 Patent technology in 1981. *See Data Gen. Corp. v. G.S.A.*, 78 F.3d 1556, 1565 (Fed.Cir.1996) (party may be estopped from taking contrary positions in subsequent legal proceedings); *see also In re Kathawala*, 9 F.3d 942, 945 (Fed.Cir. 1993) (noting a patentee "cannot claim exemption from the consequences of his own actions"); *Shramrock Tech., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed.Cir.1990) (estoppel may be applied to prevent one from benefitting from his own wrong).

## EXEMPLARY DAMAGES.

■ 48. Under Colorado law, exemplary damages are awarded both to punish a fraudfeasor and to deter similar conduct in the future. *Lexton–Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 822 (Colo.1992) (purpose of exemplary damages is to punish and deter).

49. The University doctors are the true and sole inventors of the subject matter of the '634 Patent. *Cyanamid IV*, 105 F.Supp.2d at 1181.

50. The doctors wrote up the results of their studies in an article entitled "Inadequate Iron Absorption from Many Prenatal Multivitamin—Mineral Supplements" (the "Article"). *Cyanamid IV*, 105 F.Supp.2d at 1168–69.

51. The focal point of scientific interest in the Article was Table I, which presented the results of the doctors' studies in a distinctive format with four main columns,

nine subcolumns and 12 rows. *Cyanamid IV*, 105 F.Supp.2d at 1169.

52. As was the practice of Dr. Allen and Dr. Ellenbogen, a confidential courtesy copy of the Article was provided to Dr. Ellenbogen. *Id.*

53. Within days of receiving the Article, Dr. Ellenbogen filled out a "Record of Inventorship" claiming sole inventorship of the '634 Patent technology. *Id.*

54. Without informing the doctors, Cyanamid copied and plagiarized significant portions of the Article, including Table I, into a patent application. *Id.* at 1178–79 & n. 9 (patent application was "derived virtually wholesale from the [doctors'] Article"; application includes "an almost verbatim recitation of the 'Methods' section of the Article"; different typeface and left justification of retyped words and acronyms, gaps and breaks where line running across columns was cut and numerous other indications "clearly and convincingly supported a finding" that Table I and Figures 1–4 were altered by Cyanamid and then photocopied into the patent application).

55. Despite such conduct, in its Answer filed in this action, Cyanamid denied it copied, plagiarized and otherwise lifted without permission large portions of the doctors' Article. *See* Answer at ¶ 25.

56. As part of the patent application, Dr. Ellenbogen completed an affidavit of inventorship, swearing he was the true and sole inventor of the technology. *Cyanamid IV*, 105 F.Supp.2d at 1169.

57. Cyanamid's patent application filed in December 1981, claimed exclusive rights to the reformulation and named Dr. Ellenbogen as its sole inventor. *Id.*

58. The '634 Patent issued to Cyanamid in 1984. *Id.*

59. From 1984 until 1993, Cyanamid enforced its patent rights against generic competitors. *Id.*

60. Notwithstanding the doctors' personal and professional relationship with Dr. Ellenbogen, and in part, to secure the doctor's continued cooperation and work, neither Dr. Ellenbogen nor Cyanamid mentioned anything about the patent application, the filing of an affidavit in support of it crediting Dr. Ellenbogen with instigating and supervising all of the studies, the issuance of the Patent itself, the award given Dr. Ellenbogen for being named the inventor on a successful patent, or the civil enforcement and cease and desist actions brought by Cyanamid against generic competitors. *Id.* Based on this conduct, I find Cyanamid betrayed the doctors' trust, exploited their work for pecuniary gain and thwarted their intent that their discovery inure to the benefit of the public generally—not just Cyanamid. *Cyanamid III*, 974 F.Supp. at 1353–1354, 1357.

61. I again find beyond a reasonable doubt that Cyanamid's clandestine and deceptive conduct relating to the application for and issuance of the '634 Patent, together with its exploitation of the doctors for its own gain, was attended by circumstances of fraud, malice and willful and wanton misconduct and that Drs. Allen and Seligman are entitled to an award of exemplary damages. C.R.S. § 13–21–102(1)(a).

62. Accordingly, I reinstate my earlier exemplary damage award and order Cyanamid to pay each Doctor $500,000 in exemplary damages.

### EQUITABLE RELIEF.

63. As set forth in my Preliminary Opinion, evidence on damages and equitable remedies was reopened on remand.

*Cyanamid V,* 153 F.Supp.2d at 1234–37. This new evidence, together with the testimony of numerous additional fact and expert witnesses presented for the first time by both sides at the retrial, was sufficient to allow for the quantification of value/profits realized by Cyanamid attributable to the wrongfully obtained and enforced '634 Patent. *Id.* at 1237. *See Cyanamid IV,* 105 F.Supp.2d at 1184–85 (the question of the proper amount, if any, Cyanamid should be required as a matter of equity to disgorge is one that will be decided in the proceedings related to the retrial of damages issues and related equitable remedies).

**Colorado Law Allows for the Award of Both Legal and Equitable Remedies under the Circumstances Present.**

64. As the Federal Circuit specifically recognized in *Cyanamid,* 196 F.3d at 1371 and 1374, Plaintiffs' state-law claims for fraud and unjust enrichment are governed by Colorado law, as long as federal patent standards of inventorship are applied in determining liability. *Cyanamid V,* 153 F.Supp.2d at 1243. I applied those federal standards of inventorship in *Cyanamid IV,* 105 F.Supp.2d at 1176–82, again finding Cyanamid liable to Plaintiffs for fraud and unjust enrichment. *Id.* at 1183–85.

65. My analysis of the remedies Colorado law affords a plaintiff under the present circumstances is set forth fully in my Preliminary Opinion, and will not be repeated here. See *Cyanamid V,* 153 F.Supp.2d at 1242–44 (citing *EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.,* 900 P.2d 113, 118 (Colo.1995) and Dobbs, *Law of Remedies,* § 4, 1(1) and finding Colorado law recognizes applicability of benefits-based approach to equitable relief under certain circumstances and concluding restitution or disgorgement of profits may be appropriate where defendant gains more from its wrongful misconduct than plaintiff loses). Here, where the very method used to assess what Plaintiffs "lost" presumes away an integral part of that loss (i.e., the prerogative *not* to patent) a benefits-based approach to relief is appropriate.

66. As set forth in my opinion on liability issues on remand and discussed in detail in my Preliminary Opinion on damages issues, the unfair and unauthorized benefit secured by Cyanamid was not its use of the Doctors' reformulation idea or manufacture and sale of reformulated Materna, but the right to exclude others from doing so. *Cyanamid IV,* 105 F.Supp.2d at 1184, *Cyanamid V,* 153 F. Supp.2d at 1241–42, 1244–45. Securing this right was directly contrary to the Doctors' intent and deprived them of their prerogative as scientists, and the University of its prerogative as an academic and research institution, not to have their ideas monopolized by a single entity for greatest financial gain, but to allow them to "inure to the good of society" generally. *Cyanamid IV,* 105 F.Supp.2d at 1175 (citing *Blonder–Tongue La. v. University of Illinois Found.,* 402 U.S. 313, 345, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)); *see Cyanamid V,* 153 F.Supp.2d at 1242 & n. 8 (noting that, given the general rule that " 'ideas in the public domain inure to the good of society,' " there clearly is no requirement that all patentable ideas actually be patented). The loss of this prerogative is not compensable by any analysis of what the Doctors "could have" commanded for a "willing sale" of the technology, because such an analysis presumes that loss away. *Cyanamid V* at 1242. A better approach, and one afforded me as a matter of equity under Colorado law, is to focus on the benefit Cyanamid gained as a result of its misconduct. Because the fraudulent patenting of another's technology allowed Cyanamid to realize profits it would not

have realized but for its misconduct, I concluded the retention of those profits would be unjust under Colorado law. *Cyanamid IV* at 1184, *Cyanamid V* at 1244, 1245.

67. Contrary to Cyanamid's suggestion in its Objections to Plaintiffs' .Proposed Findings/Conclusions, I reiterate that my articulation of both · legal and equitable remedies in this case is mindful of the principle against double recovery, and does not contravene my preliminary finding that overlapping remedies cannot be awarded. Given that Cyanamid's ill-gotten gains from their wrongful conduct exceed Plaintiffs' actual loss as a result of Cyanamid's fraud, Plaintiffs' combined remedy on their fraud and unjust enrichment claims "can be quantified in terms of the price the University could have commanded in the hypothetical 1981 transaction for exclusivity rights *plus* the difference between Cyanamid's ensuing profits less that purchase price, *or simply, Cyanamid's patent-related profits* [assuming the latter exceed the former]." *Cyanamid V*, 153 F.Supp.2d at 1246 (emphasis added), *c.f.* Cyanamid's Objections to Pls.' Proposed Findings/Conclusions at 56–57.

68. Based on my findings of liability and the extreme culpability of Dr. Ellenbogen and Cyanamid in 1981, and continuing throughout the pendency of the patent application and thereafter, together with the wealth of new evidence establishing that Cyanamid realized substantial value in the form of exclusivity-based profits as a result of its misconduct, I find and conclude that Cyanamid's retention of those profits would be unjust and that Cyanamid should be ordered to disgorge them. *Cyanamid V*, 153 F.Supp.2d at 1244. My analysis in this regard was informed by my knowledge and review of Colorado law and the persuasive testimony of Plaintiffs' expert, Professor Daniel Rubinfeld, at the dam-

ages retrial. *Id.* The remedy is separate and independent from Plaintiffs' remedy at law, in that it is premised on the benefits realized by Cyanamid as a result of its misconduct, rather than the University's demonstrated financial loss. *Id.*

69. Cyanamid's unjust enrichment is determined by calculating profits—sales less production and marketing/distribution costs—attributable to the right to exclude generic competition gained from the '634 Patent (the "Patent–Related Profits"). *Cyanamid V*, 153 F.Supp.2d at 1245, Rubinfeld Tr. at 653, 662; Ex. 1870. In arriving at the Patent–Related Profits, Professor Rubinfeld properly excluded profits Cyanamid was able to earn from sales of Materna without the use of the '634 Patent. Rubinfeld Tr. at 653.

70. As stated in my Preliminary Opinion, I found Professor Rubinfeld's analysis competent and his presentation at trial persuasive. Given his background and experience, significant weight is accorded his analysis and calculation of the Patent–Related Profits. *See Cyanamid V*, 153 F.Supp.2d at 1245.

### Patent–Related Profits.

71. The prescription prenatal multivitamin market is and has been highly competitive. Ex. 605, at A068561.

72. The value of the '634 Patent can be properly quantified by evaluating the performance of Stuartnatal 1+ 1, which competed head-to-head with Materna but which did not have the protection of a patent. Rubinfeld Tr. at 652–68, Ex. 732, at A063883. *See Cyanamid V*, 153 F.Supp.2d at 1245.

73. During the relevant time period, Stuartnatal 1+ 1 was a co-industry leader with Materna of the prenatal multivitamin market. *E.g.*, Cyanamid 1990 Marketing Plan, Ex. 313, at A001403, *see* Rubinfeld Tr. at 654–656.

74. Generic competition tends to be targeted at the most successful branded products in a given market. Rubinfeld Tr. at 656; Ex. 653, at A068545; Damson Tr. (5/14/96) at 1486. This was true in the prenatal multivitamin market. Ex. 605, at A068565; Ex. 653, at 068533, 068541. Consequently, when there is no patent protection, the market leaders typically have the highest substitution rate. Ex. 653, at A068541.

75. The benefits of patent protection against generic competition are amply illustrated by the reaction of generic competitors to Cyanamid's 1994 decision to stop enforcing, and promoting Materna on the basis of, the '634 Patent. Ex. 579 (internal memo referencing specter of "prior art" invalidating patent and requesting removal of patent marking from Materna product and sales literature),[5] Ex. 681, at A068497 (1998 Cyanamid marketing report: when this [litigation concerning ownership and inventorship of Cyanamid's patent] was made public, generics quickly cropped up against "Materna"); see Ex. 677, at A068321 ("The only deterrent to this behavior [generic substitution] to date has been to secure patented status for a formulation."); Ex. 605, at A068577 (1995 Strategic Options Report: "While the outcome of the [instant] patent litigation is ... unknown, it could have significant financial implications on Materna's future income stream. Additionally, as the litigation becomes more public should an unfavorable decision be rendered generic intrusion will undoubtedly become more widespread for the brand."); Ex. 653, at A068545 ("If the outcome [patent litigation] is unfavorable it could have significant financial implications for Materna's future income stream, by providing [t]he

entree for more generic competitors."); Ex. 585, at A063856 ("Without the patent, substitution will eventually become an issue and affect the brand's long-term growth. Once the litigation is public, Materna will become increasingly more vulnerable to substitution, especially once it becomes a dominant brand.").

76. Stuartnatal 1 + 1 is a proper comparison product for determining the impact of generic substitution on a non-patent protected Materna in a "but for" world, that is, a hypothetical world in which Cyanamid would not have the '634 Patent to shield Materna from competition. Rubinfeld Tr. at 654, 656; Ex. 313, at A001403.

77. In 1994, Stuartnatal 1 + 1 had a 65 percent substitution rate. Ex. 605 (6/95 Strategic Options Report for 1996–98) at A068565. At the same time, and as a result of the '634 Patent, Materna's substitution rate was significantly less. See Ex. 605 ("Up until now [6/95], Materna has been protected from generic substitution by its patent status which is based on the ratio of magnesium to calcium and the ratio's beneficial impact on iron absorption.").

78. I was persuaded by Dr. Rubinfeld's testimony that it would be appropriate to assume that in the "but for" world of an unpatented Materna, the generic substitution rate for Materna would be substantially similar to the actual substitution rate for Stuartnatal 1 + 1. See Rubinfeld Tr. at 659.

79. Based on the evidence presented at trial and the opinions and analysis of Dr. Rubinfeld, I find the time frame for determining unjust enrichment should be between February 14, 1984, when the patent

---

5. As set forth above, notwithstanding the fact that this action was pending at the time, Cyanamid did not raise the issue of "prior art" in this case until the damages retrial in 2001.

was issued, and the end of 1994, when this litigation as well as other challenges to the '634 Patent caused Cyanamid to stop enforcing it.

80. Unjust enrichment calculations are limited to domestic sales of Materna because the patent did not confer a right to exclude generic competition internationally. Rubinfeld Tr. at 665.

81. I find that Plaintiffs' analysis (provided through Professor Rubinfeld) reasonably, accurately, and conservatively determined the Patent–Related Profits, which I find to be $23,243,228 (without prejudgment interest) for the period February 14, 1984 to December 31, 1994. Rubinfeld Tr. at 643–644, 664; Ex. 709, at 32. These Patent–Related Profits properly exclude amounts Cyanamid paid in production, marketing, distribution and other variable costs associated with the manufacture and sale of Cyanamid under the '634 Patent. Ex. 1870.

## CONCLUSIONS OF LAW REGARDING UNJUST ENRICHMENT.

■ 82. Once the federal standards for inventorship were applied in determining Cyanamid's liability under a theory of unjust enrichment, it is Colorado law that governs the concept and analysis of what remedies may be appropriate. *See Cyanamid,* 196 F.3d at 1374.

■ 83. The power to fashion equitable remedies lies within the discretion of the trial court. *La Plata Med. Ctr. Assocs. v. United Bank of Durango,* 857 P.2d 410, 420 (Colo.1993) (citing Restatement (Second) of Contracts § 357 cmt. c (1981)); *see EarthInfo,* at 119. In exercising this discretion, the trial court "has the power to choose between two or more courses of action and is therefore not bound in all cases to select one over the other." *Colo-*

*rado Nat'l Bank of Denver v. Friedman,* 846 P.2d 159, 166 (Colo.1993).

■ 84. The scope of the remedy for unjust enrichment "is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n,* 649 P.2d 1093, 1097 (Colo.1982) (en banc).

85. In determining whether restitution of profits/disgorgement is appropriate, the Colorado Supreme Court has stated:

> [T]he court must resort to general considerations of fairness, taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest. 1 George E. Palmer, *The Law of Restitution* § 2.12 at 161 (1978) .... Thus, the more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits. *See, e.g.,* Douglas Laycock, *The Scope and Significance of Restitution,* 67 Tex. L.Rev. 1277, 1289 (1989). The trial court must ultimately decide whether the whole circumstances of a case point to the conclusion that the defendant's retention of any profit is unjust.

*EarthInfo,* 900 P.2d at 119.

86. After the first trial, I concluded that Cyanamid was liable for unjust enrichment under Colorado law, because it misappropriated and profited from the doctors' invention under circumstances that it would be inequitable for Cyanamid to retain this benefit. *Cyanamid III,* 974 F.Supp. at 1354–55; *see Cablevision,* 649 P.2d at 1097 *cited with approval in Cyanamid,* 196 F.3d at 1374 ("This court notes,

however, that [under *Cablevision* ] a defendant who uses a benefit provided by the plaintiff in an unauthorized and unfair manner may be liable in Colorado for unjust enrichment.").

87. On remand, I again concluded that Cyanamid was liable for unjust enrichment because "a benefit was conferred on Cyanamid by the Plaintiffs under circumstances that make its retention, without compensation, inequitable." *See Cyanamid IV*, 105 F.Supp.2d at 1184, *see also id.* at 1183 (describing some of the benefits Plaintiffs conferred upon Cyanamid).

88. Each of the factual findings I made underlying that conclusion was based on substantial and credible evidence. I reincorporate those findings here.

89. Based on my findings of liability and the extreme culpability of Dr. Ellenbogen and Cyanamid in 1981, and continuing throughout the pendency of the patent application and thereafter, together with the wealth of new evidence establishing that Cyanamid realized substantial value in the form of exclusivity-based profits as a result of its misconduct, I find and conclude that Cyanamid's retention of those profits would be unjust.

90. I conclude that Cyanamid's Patent–Related Profits were $23,243,228 for the period February 14, 1984 to December 31, 1994, without prejudgment interest. Rubinfeld Tr. at 664; Ex. 709 at 32. These Patent–Related Profits properly exclude amounts Cyanamid paid in production, marketing, distribution and other variable costs associated with the manufacture and sale of Cyanamid under the '634 Patent. *See Cyanamid V*, 153 F.Supp.2d at 1244, Ex. 709, at 32; Rubinfeld Tr. at 664.

## OVERLAP BETWEEN EQUITABLE AND LEGAL REMEDIES.

91. I have determined that Cyanamid is liable to Plaintiffs under both state-law legal and equitable theories of relief—fraud and unjust enrichment.

92. Plaintiffs' fraud damages were measured in terms of the financial opportunity lost in 1981 when Cyanamid acted secretly to patent the Doctors' reformulation concepts rather than pay the University for exclusive rights to them. As explained in my Preliminary Opinion, however, this approach not only fails fully to compensate Plaintiffs for that which they lost as a result of Cyanamid's fraud, *see Cyanamid V*, at 1241–42 (Plaintiffs were deprived not only of their hypothetical right to sell exclusive rights to their invention but also their right *not* to do so), but also allows Defendants to retain the profits earned as a result of a hypothetical "deal" it was clearly established would never have been struck. *See id.* (benefits-based approach to remedy appropriate where benefit to defendant wrongdoer exceeds loss to plaintiff). Under these circumstances, Colorado law allows for the award of both legal and equitable remedies, as long as the principle against double recovery is taken into consideration. *See id.* at 1243–44 (citing *EarthInfo*, 900 P.2d at 119 and caselaw/materials cited therein).

93. No easy formulas exist for determining when restitution of profits realized by a party in a given case is warranted. Because it is an equitable remedy, however, Colorado law provides that it is left firmly in the trial court's discretion to fashion. *Cyanamid V*, at 1243.

94. Based on the limited nature of the evidence presented at the first trial on the issue of damages, I determined that Plaintiffs' damages and Cyanamid's gains coincided—Cyanamid's "gain" was the amount it did not pay Plaintiffs for exclusive rights to the reformulation technology. *Cyan-*

*amid III,* 974 F.Supp. at 1359, *discussed in Cyanamid V,* 153 F.Supp.2d at 1234.

95. The issue of disgorgement was not fully litigated in the first trial, however, largely because of Cyanamid's failure, in discovery leading up to the first trial, to produce profits and similar evidence related to the value of the '634 Patent on grounds such evidence was irrelevant. *Cyanamid V,* 153 F.Supp.2d at 1234. As I have noted above, however, substantially more and different evidence was presented at the damages retrial, in large part because Cyanamid for the first time disclosed marketing and financial data relating to Materna and the value of the '634 Patent.

96. Based on this new evidence (as well as on the evidence from the first trial), I find and conclude that there is a significant difference between, on the one hand, Plaintiffs' loss as measured by Cyanamid's failure to secure and pay for exclusive rights to the '634 Patent technology before patenting it and, on the other hand, Cyanamid's gains as a measure of those profits it earned that were attributable to the fraudulently obtained patent.

97. Fundamental to any remedial scheme is the proposition that a plaintiff generally may not recover twice for the same injury. *E.g., MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express, Inc.,* 962 F.2d 1470, 1473 (10th Cir. 1992). This concept is consistent with the Colorado Supreme Court's admonition in *EarthInfo* that it may be appropriate for a court to impose upon the wrongdoer the burden of proving offsets to profits that will be disgorged or, put differently, the risk of not identifying all costs and other offsets used to determine the wrongdoer's true "profits." *See EarthInfo,* 900 P.2d at 120–21.

98. The legal and equitable remedies overlap in this case. I find the principle against double recovery would preclude an award to Plaintiffs which totaled both the hypothetical price Cyanamid would have paid for exclusivity rights in 1981 *and* the gain Cyanamid realized as a result of its fraudulent and inequitable conduct. *Discussed in Cyanamid V,* 153 F.Supp.2d at 1245–46.

99. The evidence clearly establishes that Cyanamid's gains from its misconduct exceed the Plaintiffs' losses as measured by the less-than-comprehensive hypothetical-negotiation analysis, which is intended to measure Plaintiffs' theoretical actual damages only. *See, e.g., Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1109 (Fed.Cir. 1996) (noting that hypothetical-negotiation damages analysis, because it assumes willing buyer and willing seller when that assumption is contrary to actual facts, "risks creation of the perception that blatant, blind appropriation of inventions patented by individual, non-manufacturing inventors is the profitable, can't-lose course").

100. Under these circumstances, Colorado law recognizes my prerogative, in equity, to compel Cyanamid to disgorge that gain.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING FEDERAL EQUITABLE REMEDIES/CONSTRUCTIVE TRUST.

101. In *Cyanamid IV,* I concluded that the '634 Patent must be corrected to reflect that the doctors are the sole and true inventors of the '634 technology. 105 F.Supp.2d at 1185. I also concluded that Plaintiffs hold equitable title to the '634 Patent. *Id.*

102. Plaintiffs on remand argue that equitable remedies flow from these conclusions. I conclude that Plaintiffs' status as the equitable title holders to the '634 Pat-

ent from 1984 forward constitutes a separate and independent ground for requiring Cyanamid to disgorge to Plaintiffs the profits it unjustly gained as the putative holder of the Patent—that is, the Patent–Related Profits. *Cyanamid V,* 153 F.Supp.2d at 1246.

103. The disgorgement of unjust enrichment I order under this theory is an alternative to the disgorgement of unjust enrichment I ordered under Colorado law. *See Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574 (Fed.Cir.1991).

104. In awarding to Plaintiffs the Patent–Related Profits to which they are entitled as equitable title holders of the '634 Patent, however, I reject Plaintiffs' argument in support of their request for imposition of a constructive trust on Cyanamid's Patent–Related Profits based on the analogy that Cyanamid was acting as a fiduciary to Plaintiffs during the time it held legal title to the '634 Patent.

## CONCLUSIONS OF LAW REGARDING PREJUDGMENT INTEREST.

105. Colorado's prejudgment interest statute provides in relevant part:

Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever occurs first.

106. I award Plaintiffs prejudgment interest to be calculated at a rate of eight percent (8%) per annum, compounded annually pursuant to Colo.Rev.Stat. § 5–12–102(1)(b) (2000).

107. The appropriate start date for an award of prejudgment interest is the date the patent issued, February 14, 1984.

NOW THEREFORE I enter the following Orders:

## I. *Fraud Damages.*

Based on the sales figures presented at trial and compiled in Attachment 1 to Plaintiffs' Corrected Proposed Findings of Fact and Conclusions of Law, I find Cyanamid liable to the Plaintiffs for $ 22,546,000 in fraud damages (royalties at 6% from issuance of patent to December 31, 1994 with 8% interest through January 1, 2002) plus the additional prejudgment interest that has accrued from January 1, 2002 to the date of judgment.

## II. *Unjust Enrichment Remedy.*

I have found that Cyanamid was unjustly enriched by $23,243,228 (without prejudgment interest) at Plaintiffs' expense. Therefore, I find that on Plaintiffs' claim for unjust enrichment, Cyanamid is liable in the amount of $53,106,066 ($23,243,228 unjust enrichment calculated by Professor Rubinfeld using Cyanamid sales figures from issuance of patent to December 31, 1994 with 8% interest through January 1, 2002) plus the additional prejudgment interest that has accrued from January 1, 2002, to the date of judgment.

## III. *Elimination of Double Recovery: Overlap between Remedies.*

Because the amount to be disgorged as the remedy on Plaintiffs' claim for unjust enrichment is greater than Plaintiffs' fraud damages, and because I have found that the Plaintiffs are not entitled to double recovery for their fraud and unjust enrichment claims, Cyanamid is Ordered to pay to the Plaintiffs the amount of $53,106,066, which includes statutory prejudgment interest through January 1, 2002, plus additional prejudgment interest through the date of judgment.

### IV. *Exemplary Damages.*

I award Drs. Allen and Seligman $500,000 each in exemplary damages (for a total of $1,000,000).